Rolly Weldon HILL, Petitioner,

v.

The NATIONAL TRANSPORTATION SAFETY BOARD; and Donald D. Engen, Administrator, Federal Aviation Administration, Respondents.

No. 86–2825.

United States Court of Appeals, Tenth Circuit.

Oct. 3, 1989.

L.B. Ullstrom (Robert P. Smith, of Law Offices of L.B. Ullstrom, with him on the briefs), Denver, Colo., for petitioner.

Patricia A. McNall (Peter J. Lynch, Manager, Enforcement Proceedings Branch, AGC–250, Federal Aviation Admin., Washington, D.C., with her on the brief), for respondents.

Before LOGAN, McWILLIAMS and TACHA, Circuit Judges.

TACHA, Circuit Judge.

The petitioner, Rolly Weldon Hill, pursuant to 49 U.S.C.App. § 1486(a), seeks review of a decision of the National Transportation Safety Board (Board) upholding a Federal Aviation Administration (FAA) order suspending his Airline Transport Pilot Certificate for a period of 180 days on account of violations of sections 91.79(d) and 91.9 of the Federal Aviation Regulations (FARs), 14 C.F.R. §§ 91.79(d), 91.9 (1988). The Board found that the administrative law judge's decision affirming the FAA's suspension order was supported by the evidence, and that the FAA had both jurisdiction and authority to suspend Hill's pilot certificate. We affirm.

## I.

The suspension order at issue here arose out of two separate incidents involving Hill's operation of a helicopter owned by Denver television station 9KUSA, "Channel 9." The FAA's complaints based upon each of the incidents were consolidated for trial in a single administrative proceeding. The administrative law judge (ALJ) found by a preponderance of the evidence that Hill's conduct in each incident violated FARs, and therefore affirmed the FAA's order imposing the sanction of suspending Hill's pilot certificate.

The first incident occurred on August 3, 1983, when Hill was piloting the Channel 9 helicopter on a return flight to Denver. Hill was accompanied by James Berger, a photographer whom he had taken to cover a news story about an accident in the mountains west of Denver. As they neared Denver, they saw a plume of black smoke that appeared to be a newsworthy event. Hill moved closer to investigate the source of the smoke, discovering a fire in a wheat field. Five fire units and approximately thirteen firefighters were engaged in putting out the fire, which had encompassed nearly one-third of the sixty-acre field by the time Hill's helicopter arrived on the scene.

Hill flew over the fire at altitudes that by his admission were as low as fifty feet, and by the accounts of witnesses on the ground ranged from thirty to seventy-five feet. While flying at such low altitudes, the rotorwash from Hill's helicopter apparently reignited the fire in some areas where it had previously been extinguished. According to the testimony of the firefighters, Hill's flying endangered the firefighters and their equipment and caused additional acres of wheat to be burned. In addition, one firefighter testified that he received minor burns as a consequence of the rotorwash reigniting burning embers that he was in the process of putting out.

The ALJ found that during this incident Hill violated FAR 91.79 [1] by failing to main-

---

**1.** FAR 91.79 provides:

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

(a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

tain a safe minimum altitude, and FAR 91.9 [2] by operating the aircraft in "a careless or reckless manner so as to endanger the life or property of another."

The second incident occurred on December 3, 1983, when Hill, accompanied by a news photographer and a sportswriter, piloted the Channel 9 helicopter on a flight from Denver to Brush, Colorado, for the purpose of covering a high school state championship football game. Although the weather in Denver was sunny and clear, Brush, approximately eighty miles northeast of Denver, was covered by a thick layer of fog. The dense fog bank prevented Hill from seeing the ground, so Hill flew above the fog bank to search for an opening. Hill made two unsuccessful attempts to penetrate the fog through small openings that he found, but each time the helicopter was quickly covered by fog and he lost visibility, causing him to ascend once again to a level above the fog bank.

Despite the poor visibility encountered on his previous two attempts, Hill attempted to penetrate the fog bank a third time. Hill entered an apparent opening in the fog that quickly closed over the helicopter. Although visibility ranged from zero to 300 feet, Hill decided to fly slowly through the fog. This portion of the flight lasted approximately ten minutes, at times taking Hill and his passengers below the height of telephone poles.

Finally, as the helicopter hovered in the fog over loose, powdery snow, a "white-out" condition occurred, causing Hill to lose visual reference with the surface. As a consequence of this visual impairment, Hill's attempt to land the helicopter resulted in the helicopter rolling over on the ground. In addition to considerable damage to the helicopter, both of Hill's passengers were injured. The crash site was estimated by various witnesses as between 100 and 300 feet from the side of "Road P," which apparently is a county road.

The ALJ found with regard to this incident that Hill recklessly conducted his flight operation, endangering the lives and property of others in violation of FAR 91.9.

On the basis of the FAR violations in both incidents, the ALJ concluded that the sanction which the FAA sought to impose—suspension of Hill's pilot certificate for 180 days—was "justified and required both to act as a deterrent to [Hill], to others who may be similarly disposed[,] and in the public interest of air safety." In reviewing the ALJ's ruling, the Board adopted the ALJ's findings, with slight modification, as its own.[3] On the basis of those findings, the Board determined that

---

(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

(c) *Over other than congested areas.* An altitude of 500 feet above the surface except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(d) *Helicopters.* Helicopters may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section *if the operation is conducted without hazard to persons or property on the surface.* In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the Administrator.

14 C.F.R. § 91.79 (1988) (emphasis added).

**2.** FAR 91.9 provides:

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

14 C.F.R. § 91.9 (1988).

**3.** The Board's only modification of the ALJ's findings was its disallowance of the ALJ's use of a Board investigator's testimony to support the fact that Hill failed to obtain a weather briefing prior to leaving Denver on December 3, 1983. The Board found that such testimony was unnecessary to this case, and accorded it no weight. The careless or reckless conduct requirement of FAR 91.9 was apparently satisfied by Hill's act of re-entering the fog bank a third time after two unsuccessful attempts, and thus the FAA need not also have shown an additional careless act of not obtaining a weather briefing. The Board further noted that allowing the Board investigator's testimony would be inconsistent with its policy of attempting to keep separate its enforcement and investigative functions.

In light of the fact that the Board accorded no weight to this testimony and concluded that it was unnecessary to the case, we find no basis for any claim that Hill was prejudiced by the ALJ's use of such testimony.

"safety in air commerce (or air transportation) and the public interest require that the [FAA] order be affirmed." (footnote omitted).[4]

Hill contends that the Board should have dismissed the action because the FAA lacked jurisdiction to impose sanctions upon his conduct and lacked authority to suspend his pilot certificate instead of imposing civil penalties or re-examining his competence as a pilot. Hill also contends that he was denied his seventh amendment right to a jury trial. Finally, Hill claims that the Board erred in adopting the ALJ's evidentiary rulings and findings of credibility.

## II.

■ The Board's findings of fact, "if supported by substantial evidence, shall be conclusive." 49 U.S.C.App. § 1486(e). Here, furthermore, the Administrative Procedure Act provides an identical standard. *See* 5 U.S.C. § 706(2)(E). "Our function is not to weigh the evidence or to evaluate the witnesses' credibility." *Sorenson v. National Transp. Safety Bd.*, 684 F.2d 683, 685 (10th Cir.1982).

■ The Board's interpretation of constitutional or statutory provisions, however, are reviewed de novo. *Go Leasing, Inc. v. National Transp. Safety Bd.*, 800 F.2d 1514, 1517 (9th Cir.1986); *see* 5 U.S.C. § 706(2)(B), (C). We accord deference to an administrative agency's interpretation of a statute or regulation if such interpretation is not clearly contrary to the "plain and sensible meaning" of the statute or regulation, *Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir.1976); *see Pangburn v. Civil Aeronautics Bd.*, 311 F.2d 349, 355 (1st

Cir.1962), and such interpretation involves an area within the particular expertise of the agency, *see Walker Operating Corp. v. FERC*, 874 F.2d 1320, 1332 (10th Cir.1989). "Generally, then, when a court reviews an agency's careful and studied conclusions of law pertaining to a matter clearly within the agency's expertise, the court will affirm those conclusions if they are reasonable, although an agency's 'order may not stand if the agency has misconceived the law.'" *Id.* (citations omitted) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)).

## A.

Hills' first claim—that the Board erred in failing to dismiss the FAA's order of suspension against him because the FAA lacked jurisdiction over the acts that he committed—rests upon an interpretation of the relevant statutes governing the regulation of air transportation. We therefore begin with an analysis of these statutes.

Section 307 of the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731, codified as amended at 49 U.S.C.App. § 1348, grants authority to the Administrator of the FAA[5] to develop rules and regulations relating to air transportation. Section 307(a), 49 U.S.C.App. § 1348(a), provides authority to regulate the use of "navigable airspace":

The Secretary of Transportation is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the

---

**4.** The Board stated in a footnote that "[a]lthough air transportation was not involved in this proceeding, the Board has determined ... that both incidents took place in air commerce and that safety in air commerce was affected by both."

**5.** Although the Federal Aviation Act of 1958, as amended, generally names the Secretary of Transportation as the party responsible for carrying out the purposes of the Act, Congress has transferred to the Administrator of the FAA certain "duties and powers of the Secretary re-

lated to aviation safety (except those related to transportation, packaging, marking or description of hazardous materials)." 49 U.S.C. § 106(g). The powers exercised by the FAA in this case—the rulemaking powers under § 307 (49 U.S.C.App. § 1348) and the power to suspend Hill's license under § 609 (49 U.S.C.App. § 1429)—were among such powers delegated to the Administrator of the FAA pursuant to 49 U.S.C. § 106(g). Thus, references to the Secretary in these statutes may be interpreted as including the Administrator of the FAA.

safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.

49 U.S.C.App. § 1348(a). "Navigable airspace" is defined as "airspace above the minimum altitudes of flight prescribed by regulations ... and shall include airspace needed to insure safety in take-off and landing of aircraft." *Id.* § 1301(29).

Section 307(c), *id.* § 1348(c), provides additional authority to prescribe regulations governing air traffic rules:

The Secretary of Transportation is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

*Id.* § 1348(c). In contrast to section 307(a), regulations under section 307(c) are clearly not restricted to the utilization of "navigable airspace," but are broadly directed at such concerns as the "protection of persons and property on the ground" and "prevention of collision between ... aircraft and land or water vehicles." *Id.* Like section 307(a), however, 307(c) implements one of the primary purposes of the Act—promoting air safety, *see Heller v. United States,* 803 F.2d 1558, 1566 (11th Cir.1986); *Barnum v. National Transp. Safety Bd.,* 595 F.2d 869, 872 (D.C.Cir.1979); *see also* 49 U.S.C.App. § 1421(a) (imposing duty upon Secretary to promote safety in air commerce); *id.* § 1421(b) (directing Secretary to "exercise and perform his powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation").

Section 609(a) of the Act further contributes to the promotion of air safety by authorizing the FAA to revoke, suspend, or modify an aviation certificate if the "[Secretary] determines that safety in air commerce or air transportation and the public interest requires." *Id.* § 1429(a). "Air commerce" is defined as

interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any Federal airway or *any* operation or navigation of aircraft which directly affects, *or which may endanger safety in,* interstate, overseas, or foreign air commerce.

*Id.* § 1301(4) (emphasis added). " 'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." *Id.* § 1301(10). Both "air commerce" and "air transportation" include the carriage in commerce of persons, property, or mail "whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation." *Id.* § 1301(23), (24).

■ Hill contends that the statutory prerequisite to suspending a pilot certificate—a finding that "safety in air commerce or air transportation" requires suspension—requires the FAA to show that the incidents forming the basis for suspension occurred within the scope of "air commerce or air transportation." Hill contends that because both of the incidents for which he was sanctioned involved purely *intra*state flights and occurred outside of either "navigable" airspace or airspace controlled by the FAA, the incidents could not have affected safety within "air commerce" and the FAA therefore lacked jurisdiction to suspend his certificate. We disagree.

The term "air commerce" is to be "broadly construed to effectuate a valid congressional purpose." *FAA v. Landy,* 705 F.2d 624, 634 (2d Cir.), *cert. denied,* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983), and the relevant purpose here is protecting air safety. Congress' power to regulate safety in interstate commerce is not restricted by the fact that such regulation "include[s] within its scope activities which are intrastate in character." *Rosenhan v. United States,* 131 F.2d 932, 935 (10th Cir.

1942), *cert. denied,* 318 U.S. 790, 63 S.Ct. 993, 87 L.Ed. 1156 (1943). The statutory definition of "air commerce" is therefore clearly not restricted to interstate flights occurring in controlled or navigable airspace. The face of the statute expressly provides that "air commerce" includes *"any* operation or navigation of aircraft which directly affects, or which *may endanger safety* in, interstate, overseas, or foreign air commerce." 49 U.S.C.App. § 1301(4) (emphasis added).

■ The *potential* for pilot conduct to endanger safety in interstate, overseas, or foreign air commerce is all that is necessary to support the FAA's order of suspension. The fact that the pilot's unsafe conduct in a particular instance did not actually endanger interstate, overseas, or foreign air commerce does not exempt such conduct from FAA jurisdiction. As this court previously stated in regard to a similar claim under the Civil Aeronautics Act of 1938:

> We may concede that [the pilot] could have shown that at the time the aircraft in question was in flight through, or upon, the designated airway no other aircraft was within dangerous range, but he cannot avoid the incidence of the Act by showing that these particular flights did not actually endanger interstate commerce. *Congress has not seen fit to limit the question of safety in these circumstances to a manifestation of actual danger, rather it has sought to eliminate all potential elements of danger.*

*Rosenhan,* 131 F.2d at 935 (emphasis added); *see also Roach v. National Transp. Safety Bd.,* 804 F.2d 1147, 1157 (10th Cir. 1986) (potential endangerment of life or property sufficient for violation of FAR 91.9), *cert. denied,* — U.S. ——, 108 S.Ct. 1732, 100 L.Ed.2d 195 (1988); *Haines v. Department of Transp.,* 449 F.2d 1073, 1076 (D.C.Cir.1971) (predecessor regulation

to FAR 91.9 "intended to prevent inherently dangerous practices, and it is no defense that by happenstance and in retrospect no actual danger appears"). Hill therefore may not escape FAA jurisdiction through the fortuitous circumstance that his conduct in this instance did not actually endanger interstate, overseas, or foreign air commerce. The potential for such endangerment, however slight, is a sufficient basis for the imposition of sanctions under section 609.

Hill further contends that his actions in this case were so far removed from even a potential effect on safety in interstate, overseas, or foreign air commerce to preclude FAA jurisdiction under section 609. Whether danger to air commerce was "inherent in the pilot's conduct," or whether "danger might have developed in the ordinary course of events[,] is a matter for the Board's determination in the reasonable exercise of its expert judgment." *Haines,* 449 F.2d at 1076. We therefore will not substitute our judgment for the expert judgment of the Board regarding whether danger to air commerce might have developed as a consequence of Hill's conduct, or the degree of danger necessary to justify a suspension. *See id.*[6]

Additionally, the deterrence of future unsafe acts in air commerce through suspension of a pilot certificate is sufficiently related to safety in air commerce to provide a further basis for FAA jurisdiction over Hill's conduct. The sanctions imposed under section 609 serve an important disciplinary purpose that contributes to air safety through deterring future unsafe conduct by the offending pilot and others who may be disposed to engage in similar conduct. *See Go Leasing,* 800 F.2d at 1519–21; *Pangburn,* 311 F.2d at 354–55. "Surely, it cannot be gainsaid that the power to impose a suspension on an errant pilot in an appropriate case will go far 'to insure the maximum possible safety.'" *Id.* at 355. Here, the ALJ specifically found that sus-

---

**6.** Given the fact that goods, persons, or mail traveling "partly by aircraft and partly by other forms of transportation" are within the scope of interstate, overseas, or foreign air commerce or air transportation, *see* 49 U.S.C.App. § 1301(23),

(24), Hill's conduct could easily pose a hazard to air commerce by endangering persons or property on the ground that could have been in the process of being transported to an air terminal for interstate, overseas, or foreign shipment.

pension was "justified and required both to act as a deterrent to [Hill], to others who may be similarly disposed[,] and in the public interest in air safety."

By holding a pilot certificate issued by the FAA, Hill submitted to the FAA's jurisdiction regarding any operation of aircraft under that certificate that may affect safety in air commerce. When, as here, the pilot has operated an aircraft in a careless or reckless manner that may be deemed inherently dangerous, *see Haines*, 449 F.2d at 1076, such conduct potentially affects air safety. The FAA clearly has jurisdiction to take appropriate action to deter future unsafe conduct by Hill or other certificate holders if it determines that safety in air commerce requires such action.

### B.

■ Hill's next contention is that even if the FAA has jurisdiction over his conduct during the two incidents at issue here, the FAA abused its discretion by ordering the suspension of his license. Hill contends that the FAA lacks authority under section 609 of the Act, 49 U.S.C.App. § 1429, to suspend his pilot certificate for violations of FARs. Hill bases his argument, in part, on the fact that section 609 does not contain a reference to regulatory violations as a predicate to pilot suspension.[7] Alternatively, section 901 specifically authorizes monetary sanctions for FAR violations.[8] Hill concludes that section 609 therefore allows suspension only when pilot qualifications are at issue and that the only proper recourse against him is a civil penalty under section 901. We disagree.

Hill's position is unfounded and has been squarely rejected by other circuits. *See, e.g., Komjathy v. National Transp. Safety*

*Bd.*, 832 F.2d 1294, 1296 (D.C.Cir.1987) (per curiam) ("[t]here is clear statutory basis for the FAA's policy of suspending airman certificates as a sanction for violation of FARs"), *cert. denied*, —— U.S. ——, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988); *Go Leasing*, 800 F.2d at 1517–19; *Pangburn*, 311 F.2d at 354–56. Although section 609 does refer to the authority to "reexamine any civil airman," 49 U.S.C.App. § 1429(a), the statute is plainly not restricted to pilot qualifications. The Act gives the FAA broad discretion to suspend a pilot certificate as a result of re-examination of a civil airman, "or if, as a result of *any other investigation* made by the Secretary of Transportation, he determines that safety in air commerce or air transportation and the public interest requires." *Id.* (emphasis added). Such an investigation may clearly include an inquiry into regulatory violations, as was involved here.

As the Ninth Circuit has stated:

> Agencies charged with a prosecutorial function must have flexibility in confronting the varieties of facts presented in particular cases. There is no question that the [FAA] Administrator has the legal discretion to choose between employing section 609 certificate action and section 901 civil money penalty remedies.

*Go Leasing*, 800 F.2d at 1518 (citation omitted). Here, the FAA did not abuse its discretion in seeking suspension of Hill's certificate. *See id.*

### C.

■ Hill makes several other claims, all of which lack merit. Hill argues that because he may lose several thousand dollars in earnings as a consequence of the suspen-

---

**7.** Section 609 provides, in part:

> The Secretary ... may ... reexamine any civil airman. If, as a result of any such ... reexamination, or if, as a result of any other investigation made by the Secretary ... he determines that safety in air commerce or air transportation and the public interest requires, the Secretary ... may issue an order ...suspending ... in whole or in part, any type certificate....

49 U.S.C.App. § 1429(a).

**8.** Section 901 provides, in part:

> Any person who violates ... any provision of subchapter III, IV, V, VI, VII or XII of this chapter or of section 1501 or 1514, or 1515(e)(2)(B) of this title or any rule, regulation, or order issued thereunder ... or any term, condition, or limitation of any permit or certificate issued under subchapter IV of this chapter ... shall be subject to a civil penalty of not to exceed $1,000 for each such violation....

49 U.S.C.App. § 1471(a)(1).

sion of his pilot certificate, the administrative action before the FAA somehow became an action at common law involving a value in controversy exceeding twenty dollars for which the seventh amendment requires a jury trial.

Although Congress provided for a jury trial in the case of civil penalties imposed under section 901, *see* 49 U.S.C.App. § 1473(b), Congress chose not to include a similar provision for administrative proceedings regarding the suspension, modification, or revocation of a pilot certificate. Administrative proceedings regarding suspension of a pilot certificate involve the special expertise of the FAA and are not suits at common law for which a jury trial is required. *See Curtis v. Loether,* 415 U.S. 189, 194 & n. 8, 94 S.Ct. 1005, 1008 & n. 8, 39 L.Ed.2d 260 (1974). Neither does the value at issue exceed twenty dollars merely because of the collateral effects of suspension such as a loss of wages. The seventh amendment right to a jury trial is therefore inapplicable here.

██ Hill also claims that the suspension of his license violated his first amendment rights. This claim is unfounded, as Hill clearly cannot exempt himself from FAA safety regulations by virtue of the fact that he may have been en route to or engaging in newsgathering activities.

Finally, Hill contends that the Board erred in adopting the ALJ's evidentiary rulings and findings of credibility. As noted above, "[o]ur function is not to ... evaluate the witnesses' credibility." *Sorenson,* 684 F.2d at 685. After a review of the record as a whole, we conclude that the Board's findings of fact are supported by substantial evidence.

We have examined the rulings in question and find no abuse of discretion or decision contrary to law. Accordingly, we uphold the Board's decision.

### III.

In summary, we hold that the FAA had jurisdiction over Hill's conduct in both incidents, and that the FAA had authority to seek suspension of his pilot certificate.

Hill was not entitled to a jury trial, and the Board did not err in adopting, as modified, the findings of the ALJ. The Board's decision upholding the suspension of Hill's pilot certificate is therefore AFFIRMED.